1  Victor A. Sahn (CA Bar No. 97299)
      vsahn@sulmeyerlaw.com
2  Mark S. Horoupian (CA Bar No. 175373)
      mhoroupian@sulmeyerlaw.com
3  **Sulmeyer**Kupetz
   A Professional Corporation
4  333 South Hope Street, Thirty-Fifth Floor
   Los Angeles, California  90071-1406
5  Telephone: 213.626.2311
   Facsimile: 213.629.4520
6
   (Proposed) Attorneys for Majestic Towers, Inc.,
7  Debtor and Debtor in Possession

8
               **UNITED STATES BANKRUPTCY COURT**
9
               **CENTRAL DISTRICT OF CALIFORNIA**
10
               **LOS ANGELES DIVISION**
11
   In re                               CASE NO  2:11-bk-28407-BB
12
   MAJESTIC TOWERS, INC., a California   Chapter 11
13 Corporation,
                                        **EMERGENCY MOTION FOR ORDER**
14          Debtor.                     **AUTHORIZING CHAPTER 11 DEBTOR**
                                        **IN POSSESSION TO USE CASH**
15                                      **COLLATERAL, FOR TURNOVER OF**
                                        **PROPERTY AND FOR ORDER**
16                                      **DIRECTING KEEPER PUT ONTO**
                                        **DEBTOR'S PROPERTY BY CITY OF LOS**
17                                      **ANGELES TO VACATE PROPERTY;**
                                        **DECLARATION OF VICTOR A. SAHN**
18                                      **[omnibus declaration of Barry Kaplan**
                                        **filed concurrently herewith]**
19

20
                                        Date:    April 29, 2011
21                                      Time:    3:30 P.M.
                                        Place:   U.S. Bankruptcy Court
22                                               Courtroom 1475
                                                 255 East Temple Street
23                                               Los Angeles, CA 90012

24

25

26

27

28

*(left margin, vertical text)* **Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

## I.

## **Brief Statement of Relief Requested in Ex Parte Motion**

The Chapter 11 Debtor, Majestic Towers, Inc. ("Debtor" or "Majestic") hereby requests the following relief in this Motion[1]:

A.     Relief for authorization to use cash collateral in which True North Mezzanine Investment Fund SPE, LLC asserts a security interest on the Debtor's property located at 3515 Wilshire Boulevard, Los Angeles, California 90010 which property is improved with a 385 room, 12-story hotel known as "The Wilshire Hotel." Further, to the extent that the City of Los Angeles has a security interest in cash collateral (which the Debtor disputes), for a further order finding that they are adequately protected by continued hotel operations, payment of Transient Occupancy Taxes on a postpetition basis and the efforts of the Debtor to market and sell the hotel Property.  These efforts shall continue after the Bankruptcy filing.  The Debtor believes they will be successful if allowed to go forward without the continuing interference of the City in hotel operations.

B.     Relief asking for turnover from the City of Los Angeles and the Los Angeles County Sheriff on account of the funds which they have levied upon from operations of The Wilshire Hotel.  The estimate of the funds which they have collected is approximately $180,000 and may increase to over $200,000 in short duration.

C.     Relief that the attachment lien by possession of the City on the assets of Majestic Towers, Inc. is avoidable as a preference by virtue of the provisions of Section 547 of the Bankruptcy Code and under the provisions of Section 493.030 of the California Code of Civil Procedure.[2]  Accordingly, the City does not have a valid or

---

[1] As set forth below, 3515 Wilshire, LLC is the owner of the hotel property that is the subject of a separate bankruptcy proceeding, filed concurrently herewith.  3515 Wilshire leases the hotel to Majestic.  Because there may be competing claims and interests in the cash collateral generated by the operation of the hotel property, both debtors have sought essentially the same relief, which is the use of cash collateral to pay the operating expenses associated with the hotel business and the maintenance and preservation of the underlying property.

[2] Section 493.030(b) of the California Code of Civil Procedure provides that "(b) The filing

**SulmeyerKupetz,** A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  enforceable interest in the Debtor's cash collateral.

2          D.      Relief that requires the Los Angeles County Sheriff and the keepers

3  put on the Debtor's property to vacate the premises located at 3515 Wilshire Boulevard

4  and known, as stated, as The Wilshire Hotel.

5          The relief requested herein is justified by applicable law and facts of this

6  bankruptcy case and the within Motion.  The relief requested herein is based upon this

7  Motion, the declaration of Barry Caplan made a part hereof, the pleadings on file in this

8  bankruptcy case, and the argument of counsel at the hearing on this matter.

9                                          II.

10  **Background of the Debtor's Business and Genesis of Business Problems**

11          A.      The Debtor and Its Business

12          The Chapter 11 Debtor is the owner of "The Wilshire Hotel" located at 3515

13  Wilshire Boulevard, Los Angeles, California 90010. (the "Property")  The Property has

14  385 rooms including 375 rooms and 10 suites.  It is centrally located within the Wilshire

15  Center Market of Los Angeles.

16          The clientele that the Property attracts are tour and travel guests, airline

17  crews, and businesspeople.  For example Asiana Air rents as much as 80 to 90 rooms

18  each day.  There are other "corporate" accounts at the hotel of this nature. The Debtor

19  operates the  Hotel under a Lease Agreement between the Debtor and the owner of the

20  hotel.  The owner of the Hotel, 3515 Wilshire, LLC has also commenced a bankruptcy

21  case concurrently herewith.

22          B.      The Purchase of the Property, the Secured Debt on the Property and

23  Property Ownership

24          The Property is encumbered, to the best knowledge of the Debtor, with an

25  encumbrance in favor of True North Mezzanine Investment Fund SPE, LLC, a Delaware

26  of a petition commencing a voluntary or involuntary case under Title 11 of the United

27  States Bankruptcy Code(Bankruptcy) terminates a lien of a temporary protective order or
    of <u>attachment</u> if the lien was created within 90 days prior to the filing of the petition.

28  (emphasis added)

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  limited liability company ("True North").  True North's claim is approximately $25,500,000.

2  True North will allege that its claim exceeds this sum as they may disagree on the

3  amount of interest, default interest and similar charges.

4          The structure of ownership of the Property is as follows.  It was originally

5  purchased by either by Leo Lee and Hyo Lee, husband and wife or by the Lee 2003

6  Family Trust Dated April 8, 2003 ("Trust").  The purchase took place in September, 2005.

7  The purchase price for the hotel was $39 Million.  The down-payment in cash was

8  approximately $14,000,000 (including payment of closing costs) and a loan for

9  $26,000,000 was taken from Center Bank (the predecessor to True North).  Subsequent

10 to this purchase, Mr. and Mrs. Leo Lee have invested an additional $5 Million to keep the

11 operations going forward.  Mr. and Mrs. Lee have never been paid any funds for their

12 efforts and their ownership of the Property.[3]  They have only advanced funds to the

13 Property as referenced in this paragraph.  At the time of the purchase or shortly

14 thereafter, the owner entered into a management agreement with Majestic Towers, Inc.

15 Most of the normal course obligations of the Debtor are actually incurred through Majestic

16 as opposed to being incurred by the Debtor 3515 Wilshire.  In recent years, the Property

17 was transferred to from 3515 Wilshire, LLC by either the Trust or Mr. and Mrs. Lee.

18          C.    The Business Problems of the Debtor-Revenues and Operations

19          The business problems of the Debtor date back to the purchase of the

20 Property.  There was insufficient operating capital available for the Property other than

21 advances made to the Property by the insiders.  Second, the Debtor has a unionized

22 workforce.  The wages paid to the workforce constitute (from the Debtor's viewpoint) an

23 unreasonable amount of expense as compared with the total expenses of the Property

24 operation and as compared with the income realized each month at the Property.  Wages

25 at one point constituted sixty-eight (68%) percent of the total income realized from the

26

27 [3] However, some advances to the Property based upon a short term loan in order to
satisfy payment of a claim due to the National Labor Relations Board against the owner

28 of the Property were repaid in part.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  Property.  Typically, in a unionized facility, wages should be forty (40%) percent of

2  income based upon the industry standard.  However, if the facility is a non-union

3  establishment, wages should be 33-35% of total income.  In this Property, the difference

4  between wages being 68% versus 40% of income in a month at the Property where

5  income is $1,000,000 in a month (as is the case in the highest income months) is

6  $280,000 of cash to the Debtor's net cash.  In a lower income month, where income is

7  $700,000, the difference is $196,000 to the Debtor's net cash.

8       In the food and beverage area, the Debtor realized revenues of $1,700,000

9  in 2010.  Wages for the food and beverage business constituted approximately ninety

10  (90%) percent of income during that year.  The percentage, based upon the industry is

11  about fifty(50%) percent for a unionized business and approximately thirty-five (35%)

12  percent for non-union employees.  Accordingly, the wages paid by the Debtor to its

13  unionized employees took way between $680,000 and approximately $900,000 from its

14  net cash during 2010.

15                    1.      Labor Union Issues

16       The Debtor has attempted to negotiate with its unions and reduce the wage

17  scales and benefits (which are also very high) so that Property operations could become

18  sustainable and perhaps, profitable.  However, in spite of the fact that the operators of

19  the Hotel gave complete and thorough financial information to the unions, they were not

20  able to reach an agreement on a wage and benefit reduction.  This is a serious issue and

21  the Debtor may be taking action under applicable provisions of the Bankruptcy Code to

22  address this problem after the bankruptcy case is filed and operation are stabilized.

23                    2.      Specific Creditor Problems

24       True North Mezzanine Investment Fund SPE, LLC: The Debtor's further

25  operating problems were further damaged by issues with the following creditors.  First,

26  the Debtor fell into default with True North.  The various agreements between the Debtor

27  and Center Bank are detailed as follows.  Attached hereto as Exhibit "1" is the Business

28  Loan Agreement between the Trust and Center Bank.  Attached hereto as Exhibit "2" are

1  the Changes in Terms Agreement dated September 12, 2005, September 27, 2005 and

2  December 12, 2006.  Attached hereto as Exhibit "3" is a true and correct copy of the

3  "Promissory Note" between the Trust and Center Bank which is dated August 25, 2005.

4  Exhibit "4" is the Deed of Trust from the Trust to Center Bank.  Exhibit "5" is the

5  Assignment of Rents from the Trust to Center Bank.  Exhibit "6" is the Commercial

6  Security Agreement between the Trust and Center Bank.  Exhibit "7" is a Commercial

7  Security Agreement between Majestic Towers and Center Bank.  The loan from Center

8  has been guaranteed by Mr. and Mrs. Lee.  A true and correct copy of that guaranty is

9  attached hereto as Exhibit "8"(the guarantee is also collateralized by a Deed of Trust on

10  Mr. and Mrs. Lee's personal residence).  On August 5, 2010, the Bank gave notice of a

11  default to Mr. and Mrs. Lee and the Debtor.  Attached hereto as Exhibit "9" is a true and

12  correct copy of the bank's default letter.  Exhibit "10" is a true and correct copy of the

13  Forbearance Agreement entered into between Mr. and Mrs. Lee, Majestic Towers, Inc.,

14  the Debtor, the entity who owns Mr. and Mrs. Lee's home and True North.  There are

15  additional agreements that accompanies the Forbearance Agreement which are not

16  attached to this Motion.

17         In addition to alleged defaults under the Forbearance Agreement, the

18  Debtor has significant other financial problems including the issues that have directly lead

19  to this bankruptcy filing.

20         Far East National Bank: The Property is subject to a lis pendens in favor of

21  Far East National Bank based upon their claim that the Property was transferred from the

22  Trust to the Debtor in derogation of the rights of Far East as a creditor of the Trust.  Far

23  East has filed an action to avoid the transfer of the Property to the Debtor as a fraudulent

24  transfer and for other related relief.  Far East alleges that the lis pendens secures a claim

25  that it says exceeds $5 Million.  The Debtor disputes that claim and does not believe that

26  Far East can sustain a claim in any amount in this bankruptcy case.

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1     D.    The Debtor's Obligations to the City of Los Angeles for Transient

2            Occupancy Taxes

3            Finally, Majestic Towers, Inc. has incurred claims for Transient Occupancy

4     Taxes ("TOT") to the City of Los Angeles ("City") for the period between December, 2005

5     and April, 2009.  The TOT is authorized under Title IV of the Los Angeles County Code

6     (Code) Chapter 4.27 Transient Occupancy Tax. Under the Code, hotel/motel operators in the

7     unincorporated areas of the County of Los Angeles are required to charge the TOT of

8     fourteen percent (14%) of the rent charged to "transient" guests.  The TOT is also

9     commonly known as a "bed tax." The claim presently is $3,503,050.95 as of March 23,

10    2011 with interest on the debt equal to $956.07 per day ("Initial TOT Claim").[4]  That claim

11    only exists against Majestic Towers and is not a claim against the Property.  The Debtor

12    disputes this obligation.  However, as all income collected through the Property is

13    ultimately collected by Majestic, the collection efforts of the City for the TOT have directly

14    affected Property operations.  The City also asserts a second claim for TOT in the

15    additional amount of $3,618,444.25 ("Second TOT Claim") covering the period from May,

16    2009 to September 2010.  Debtor has paid all TOT from October, 2010 through February,

17    2011, however, the Debtor could not pay the March, 2011 TOT because of the City's

18    collection efforts on the Initial TOT Claim.

19            The Debtor's position is the true amount of the Second TOT Claim is

20    $1,443,329.00 in principal amount and does not include interest and penalties.  The

21    Debtor is disputing the Second TOT Claim as asserted by the City and that will either be

22    determined by this Court or through the appropriate processes in a non-bankruptcy forum

23    that exist for determination of these disputes.

24            The collection efforts of the City on the Initial TOT Claim came to a head on

25    April 19, 2011.  On that date, the City sent four squad car sheriff's vehicles, containing a

26    total of five uniformed and armed sheriffs to serve the levy and install the keepers on the

27

28    [4] The City claims that the Initial TOT Claim is substantially more than this amount.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  Property.  Two people who were dressed in street clothes, came in with the armed

2  sheriffs and collected funds from people who stayed at the property from that day forward

3  and have continued to do so until the present day.   The City representatives handed the

4  hotel manager a Judgment Debtor/levy by which a keeper was put in the Property.  A true

5  and correct copy of the Notice of Levy is attached hereto as Exhibit "11" to this Motion.

6  Separate from this levy, the City also served a levy upon Asiana Airlines who is the

7  Debtor's largest corporate account.  Finally, the City has levied on Majestic's bank

8  accounts.

9           It is important to note that the Debtor was not sitting on its hands prior to the

10 time that the City surprised the Debtor by installing a keeper on the Property and nearly

11 destroying the Hotel's business.  The Debtor was in constant negotiations with the City

12 through the Office of Finance of the City of Los Angeles who was responsible for working

13 to resolve the Initial TOT Claim.  Discussions also took place with the City Attorney's

14 office on the Initial TOT Claim through counsel employed by the Debtor.  It the midst of

15 these negotiations, the phalanx of personnel showed up at the Property and completely

16 threw the operations and business into a tremendous tailspin over the past eight days.

17           1.    The City's Actions Create Tremendous Damage to the Debtor

18 and Its Operations

19           The installation of the keepers on the Property whose job it is to collect

20 revenues from all income sources of the Property including room revenues, food and

21 beverage revenues, rental income, parking income, movies and convenience store

22 income has been disastrous to operations, as will be more particularly described below.

23 In response to the installation of the keepers, True North sought the appointment of a

24 Receiver on the Property on an ex parte basis.  On each occasion that this relief was

25 sought over the past eight days, the City opposed True North and succeeded in getting

26 this relief requested by True North, on an ex parte basis, denied.  On the last occasion,

27 which was on April 27, 2011, the State Court judge indicated that perhaps Majestic

28 and/or 3515 Wilshire should file a bankruptcy case.  This process has put the Debtor up

1  against a deadline of Friday, April 29 where it must meet payroll of approximately

2  $136,000 (See Debtor's Motion for Authorization to Pay Prepetition Payroll, Salaries and

3  Benefits which is separately filed herewith) to approximately 143 employees (120 full-time

4  and 23 part-time) who work at the Property.  These employees' wages and benefits will

5  not be paid without an order from this Court, resulting in the closure of the Property and

6  the loss of tremendous value in the Property, to the extreme detriment of the Debtor, its

7  creditors, its employees and its customers.

8              2.      Specific Damage Caused by the City of Los Angeles and the

9  Los Angeles County Sheriff's Actions

10             The damage causes to the business by the Sheriff's deputies and the

11  keepers includes the following-

12             a.      They made a spectacle when they arrived as described above, and

13  damaged employee morale by their actions.

14             b.      There was no warning that they were going to come to the Property

15  or that they would do so in the manner described above.

16             c.      They have levied and taken $180,000 in revenues from the Property

17  since April 19.

18             d.      The actions of the City were in local newspapers and news channels

19  (CBS, NBC, ABC, Los Angeles Times, and it has gone viral on the Internet), causing

20  harm to the Property's reputation and created an appearance of instability.

21             e.      They put up a sign that customers including hotel guests could only

22  pay with cash at the restaurant, delicatessen and the bar.

23             f.      They have intercepted all of the mail and taken any checks that have

24  arrived by mail.

25             g.      They have discussed implementing a process by which all revenues

26  would be collected in cash including room revenues.

27             h.      Two weddings scheduled for the hotel for the coming month

28  cancelled.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1        i.        The reservation systems were shut down because they threatened to

2  make the owner of the Property pay cash.

3        j.        Internet reservations have been shut down for the last 7-9 days.

4  This business constitutes 36% of the Debtor's business.  Third party reservations other

5  than internet reservations which constitute 16% of reservations have been cancelled as a

6  source of business.  Travel agency business has been cancelled which constitutes 1% of

7  room reservations.

8        k.        The news reports and television reports have been devastating to

9  business.  One report read as follows:

10       "Los Angeles is trying to collect nearly $3.5 million in unpaid taxes from
         a Koreatown hotel by posting sheriff's employees in the lobby to collect
11       cash.

12       The city attorney's office says Friday that plain clothes Sheriff's
         Department contractors called "keepers" have been posted around the
13       clock since Tuesday to collect money from the Wilshire Hotel, its
         restaurant, bar and a Starbucks it owns.
14
         Customers must pay cash. Authorities also have gone after three bank
15       accounts. City attorney's spokesman Frank Mateljan says "tens
         of thousands of dollars" have been recovered.
16
         A judge ordered the payment in March after a city audit concluded the
17       hotel owner, Majestic Towers Inc., underreported the bed taxes it
         collected from December 2005 through April 2009." (NBC LA News
18       Report)

19

20

21       The story put out by the Los Angeles City Attorney is that the Initial TOT

22  Claim was based upon "profits" that were redirected by ownership of the Property, or that

23  generally stated, the owners have engaged in some kind of nefarious conduct that lead to

24  the TOT not being paid.  This is not the truth as the information provided herein makes

25  clear.  Ownership has never been paid any funds or compensation since they purchased

26  the Property.  They have only advanced funds which they may never be repaid and which

27  totals up to $7 Million in order to keep the Property afloat.  For ownership to be falsely

28  portrayed in this manner to the news media is both untrue, damaging to the reputations of

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  Mr. and Mrs. Lee and presumably, politically motivated for the benefit of the City Attorney

2  and to make an example of the Debtor and the Property to others.

3              The cash collateral usage required hereunder is absolutely necessary to

4  protect the Debtor, its creditors, its 143 employees and its customers who utilize the

5  Property in their travel and tourism, business and corporate capacities.

6              As stated, the relief requested herein includes:

7              1.    Authorization to use cash collateral in which True North claims a

8  security interest.  The City may claim a security interest in cash collateral as well,

9  however, as they are not a creditor of the Property and because of the senior lien of True

10  North on cash collateral, the City's position will not be availing on this point.  Finally, Far

11  East National Bank has recorded a lis pendens, however, they have not liquidated their

12  claim against Mr. and Mrs. Lee which is the genesis of their claim.

13              2.    As a custodian, the City of Los Angeles and the Los Angeles County

14  Sheriff must be required to relinquish their position through the keeper as shown on

15  Exhibit "12" to this Motion and restore the Debtor, as the law requires, to possession and

16  operating control of the Property as Debtor in Possession.

17              3.    Require the turnover of the rents, income and profits collected by the

18  City of Los Angeles' keeper as these funds constitute the cash collateral of the secured

19  creditor, True North and because such funds are property of the bankruptcy estate under

20  Section 541 of the Bankruptcy Code which are subject to turnover under Sections 542 or

21  543 of the Bankruptcy Code.

22              4.    Provide for such other and further relief as is just and appropriate in

23  the circumstances.

24                                          III.

25          **The Debtor's Budget in Support of Cash Collateral Usage**

26              Attached hereto as Exhibit "12" are historical financial records for the

27  operation of the Debtor's Property.  These records are important because relative to

28  income and expenses of the Property, this gives support for the projections going forward

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1 | that are supportive of the cash collateral usage requested in this Motion.

2 | These records including actual operating results for calendar year 2010

3 | including a summary of the available rooms, the total rooms occupied at the Property,

4 | and the percentage of occupancy based upon the total rooms available for occupancy

5 | during each month that the operating results are reported.  Behind the first page of

6 | Exhibit "12" is supporting data which is prepared by the Debtor in the normal course of its

7 | business and its business records which supports all of the information and individual

8 | categories of income and expense found on the first page of Exhibit "12".

9 | Exhibit "13" contains revenue and expense projections for calendar year

10 | 2011 as well information regarding actual operations for the first three months of 2011,

11 | i.e., the months of January through March.  Again, this information is prepared by the

12 | Debtor and Access Hotel & Resorts (Access Hotel Management, LLC), who is the

13 | operator of the Property and is done in the normal course of the Debtor's business.  This

14 | information found in Exhibit "13" has supporting data behind it that gives a further

15 | foundation to the accuracy of the information provided in connection with the Debtor's

16 | operations.

17 | Exhibit "14" are the projections for operations for the months of May, June

18 | and July, 2011.  This is the budget which the Debtor wishes to operate under during the

19 | period of cash collateral usage permitted by this Court.  Based upon the historical

20 | operations during 2010 and for the first three months of 2011, the projected operations

21 | for April through July, 2011 are consistent with the information provided in Exhibits "12"

22 | and "13" in that revenues are projected to increase by approximately ten (10%) percent

23 | as they have done throughout 2010 as compared with 2009 operations.  That is exactly

24 | what the Debtor has done with 2011 projections and under the expert management of

25 | Access Hotel Management, LLC and Mr. Barry Caplan, Debtor has every reason to

26 | expect that these results will be achieved.

27 | In support of the information contained in Exhibits 12-14 as well as the

28 | balance of the factual statements contained in this Motion for Authorization to Use Cash

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  Collateral, the Debtor has submitted the declaration of Barry Caplan.  Mr. Caplan is

2  Managing Principal of Access Hotel and Resorts, a third-party hospitality company which

3  operates hotels on both North American coasts as well as the Caribbean.  Mr. Caplan

4  have cultivated strong partners throughout his career advising and/or managing assets

5  for pension and private equity funds, banks, brands and servicing companies. During his

6  tenure in the industry Mr. Caplan has opened, repositioned, managed, renovated,

7  disposed and acquired more than $500 million of hotel real estate assets.

8        To develop an additional revenue stream, Mr. Caplan built Access

9  Residential Management, providing a unique service-oriented Community Association

10  Management Company.  Currently, Access Residential, headquartered in Orlando,

11  Florida operates three Del Webb Communities in the state of Florida and is responsible

12  for managing the Home Owners Association of 15 lifestyle communities.  Prior to co-

13  founding Access Hotel Management, he held the key executive position of Senior Vice

14  President of Sales for The Melrose Hotel Company.  Over his five year tenure he was

15  responsible for overseeing $100 million in top line revenue generation which made it

16  possible for the disposition of hotel assets by owners Berwind Property Group LTD.

17  Developing a relationship with Warwick Hotels included leading the expansion of the

18  brand in North America with the conversion of the Melrose Hotel Dallas to The Warwick

19  Melrose Dallas Hotel, an AAA four diamond property.

20        Mr. Caplan's expertise in managing hotel properties, keeping their financials

21  accurately and completely is unquestioned.  In fact, for five months prior to the time that

22  the City took possession of revenues through their keepers on the Property, TOT's were

23  paid, and they would have been paid for March, 2011 and going forward as well if the

24  City had not taken their pre-emptive actions.

25        Going forward, as TOT's accrue postpetition, the Debtor will make

26  payments for the postpetition periods.  It will take some time to receive back the funds the

27  City's keepers have taken and re-establish reasonable operations after the tremendous

28  disturbance that the City's actions have caused over the last week, and which are

1 | described in detail above.

2 |       Based upon the foregoing, cash collateral usage as prayed for herein must

3 | be granted. Without it, as matters now stand, the Debtor will not be able to meet payroll

4 | on Friday, April 29, 2011 and, if that occurs, operations will likely cease and the Property

5 | will close. That will irreparably damage the Debtor in its reorganization efforts, to the

6 | detriment of 143 employees who work at the Property and to the further detriment of the

7 | Debtor's creditors and other interested parties.

8 |       It is unfortunate that the history and operations of the Property have had to

9 | come to this point. This should not have been the case. The Superior Court should have

10 | recognized the rights of True North as a secured creditor with a lien superior to any claim

11 | that the City of Los Angeles could assert. The City of Los Angeles when faced with

12 | discussions with the Debtor and True North following the installation of the keeper on the

13 | Property could have agreed to a Receiver, thereby freeing funds to pay TOT's and other

14 | normal course operating expenses. The Property could have then been positioned for

15 | sale to a buyer who would have supplied funds to pay True North in full and provide the

16 | City with a substantial dividend on their claim. Instead, in emails like Exhibit "15" which is

17 | attached hereto, counsel for the City spoke of suspicions of a conspiracy between True

18 | North and the Debtor against the City, and the City opposed the motion(s) for a Receiver

19 | that True North filed which would have solved all of the operational problems that now

20 | threaten to put the Debtor out of business. Ironically, keeping the Debtor in business

21 | would yield the City a substantial dividend on their very large claim. Closing down the

22 | Debtor means that the City might realized 10% of their claim or less, especially if the

23 | funds which they have seized would eventually be properly recognized as the collateral of

24 | True North who holds a superior lien or interest on the hotel revenues to any lien or

25 | interest held by the City.

26

27

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

## IV.

## Memorandum of Points and Authorities

A.    Jurisdiction And Summary Of Relief Requested

This Court has jurisdiction to consider the foregoing motion (the "Motion") under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Pursuant to the Motion, the Debtor seeks authority to use cash collateral to pay its ordinary and necessary operating expenses.  The statutory predicates for the relief requested herein are 11 U.S.C. §§ 363(c)(2)(B) and (c)(3) under which the Debtor seeks authority to use cash collateral.

B.    The Relief Requested is Authorized by 11 U.S.C. § 363

Section 363 of the Bankruptcy Code governs the Debtor's use of property of its estate.  Section 363(c)(1) provides in pertinent part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

A debtor in possession has all the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Code.  11 U.S.C. § 1107(a).  Section § 363(c)(2) establishes a special requirement with respect to "cash collateral", by providing that the trustee or debtor in possession may not use, sell or lease "cash collateral" under subsection (c)(1) unless (i) such entity that has an interest in such collateral consents, or (ii) the court, after notice and a hearing, authorizes such use, sale or lease.

"Cash collateral" is defined by the Code as follows:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an

1                 interest and includes the proceeds, products, offspring, rents, or
                profits of property subject to a security interest as provided in
2                 section 552(b) of this title, whether existing before or after the
                commencement of a case under this title.

3

11 U.S.C. § 363(a).

4

         The definition of "cash collateral" set forth in section 363(a) refers to section

5

552(b) of the Code, which provides:

6

7                 Except as provided in sections 363, 506(c), 522, 544, 545, 547
                and 548 of this title, if the debtor and an entity entered into a
8                 security agreement before the commencement of the case and if
                the security interest created by such security agreement extends
                to property of the debtor acquired before the commencement of
9                 the case and to proceeds, products, offspring, rents, or profits of
                such property, then such security interest extends to such
10                proceeds, products, offspring, rents or profits acquired by the
                estate after the commencement of the case to the extent
11                provided by such security agreement and by applicable non-
                bankruptcy law, except to the extent that the court, after notice
12                and a hearing and based on the equities of the case, orders
                otherwise.

13

11 U.S.C. § 552(b)(1).

14

15          It is universally acknowledged that the debtor's cash "is the life blood of the

16 business" and the bankruptcy court must assure that such life's blood "is available for use

17 even if to a limited extent". In re Mickler, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981).  Courts

18 typically authorize a debtor to use cash collateral to continue its operations so long as the

19 interests asserted by affected creditors in such cash are adequately protected.

20          As this Motion establishes, the standards for authorizing the Debtor to

21 utilize cash collateral are satisfied in this case because (i) there is a sufficient equity

22 cushion protecting True North's interest, and the interest in the cash collateral and the

23 Property, if any, held by the City of Los Angeles (this alone provides more than sufficient

24 basis for authorization of the requested use of cash collateral).  The declaration of Barry

25 Caplan indicates that offers have been received and value exists which shows a value in

26 the $38 Million range.  This represents a depressed valuation because of the business

27 problems that the Property has suffered from over the past months.  The Debtor has

28 been actively marketing the Property and will likely choose to pursue that course

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  subsequent to filing its Chapter 11 case once normalized operations are restored and the

2  upward trend that has been ongoing since November 1, 2009 when Access Management

3  came aboard will recommence; (ii) the Debtor's ongoing business operations will

4  adequately protect and preserve the value of True North's cash collateral, and (iii) True

5  North (and the City of Los Angeles and Far East National Bank, as applicable) will be

6  further adequately protected by the grant of replacement liens on post-petition inventory,

7  fixture, furniture, equipment, accounts receivable and proceeds to the extent of any

8  diminution in the value of Credit Cash's interest in cash collateral.

9  C.    True North's Interest in Cash Collateral Will Be Adequately Protected by a Substantial

10       Equity Cushion, Even If There Is Diminution in Cash Collateral

11       Under the Proposed Budget

12           As noted above, a debtor's authority to use cash collateral is typically

13  conditioned on providing "adequate protection" to entities that assert an interest in such

14  cash.  11 U.S.C. § 361.  Although the term "adequate protection" is not defined in the

15  Bankruptcy Code, Section 361 provides the following three non-exclusive examples of what

16  may constitute adequate protection:

17           (1)    requiring the trustee to make a cash payment or periodic
             cash payments to such entity, to the extent that the . . . use . . .
18           under section 363 of this title . . . results in a decrease in the
             value of such entity's interest in such property.
19
             (2)    providing to such entity an additional or replacement lien
20           to the extent that such . . . use . . . results in a decrease in the
             value of such entity's interest in such property; or
21
             (3)    granting such other relief . . . as will result in the
22           realization by such entity of the indubitable equivalent of such
             entity's interest in such property.
23

24           Neither section 361 nor any other provision of the Code defines the nature and

25  extent of "interest in property" of which a secured creditor is entitled to adequate protection

26  under section 363.  However, the statute plainly provides that a qualifying interest demands

27  protection only to the extent that the use of the creditor's collateral will result in a decrease

28  in "the value of such entity's interest in such property".  United Savings Ass'n of Texas v.

1    Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740

2    (1988).

3            Timbers teaches that a secured creditor is entitled to "adequate protection"

4    only against the diminution in value of the collateral securing its allowed secured claim.

5    Where True North has a secured claim of approximately $25,500,000, which is secured by

6    assets with a value of approximately $38 million, it follows that True North's (and, as

7    applicable, the City of Los Angeles which does not have an interest in cash collateral and

8    Far East National Bank which has a disputed, unliquidated claim against one of the

9    Debtor's principals) interest in cash collateral is adequately protected.  Moreover, separate

10    and independent of any question of diminution in value, a secured creditor has no right to

11    preservation of the equity cushion in its collateral.  The Supreme Court in Timbers

12    determined that the property interest the Debtor must adequately protect is the lien that

13    secures the creditor's claim.   Timbers, 108 S. Ct. at 630.  Further, the value of the lien may

14    not exceed the allowed amount of the secured claim.   Accordingly, the property interest of

15    an oversecured creditor (True North, in this case) that the Debtor must adequately protect,

16    namely the lien value, is the allowed amount of the secured claim and does not include the

17    equity cushion.  In In re Alyucan Interstate Corp, 12 B.R. 803 (Bankr. D. Utah 1981), the

18    court ruled that an equity cushion is not a requirement of adequate protection because a

19    secured creditor is only entitled to protection against a decline in the value of its lien.

20    Accordingly, the existence of an equity cushion (the value of the property above the lien) is

21    not a necessary component of adequate protection.  The court reasoned that section 361

22    speaks not in terms of preserving equity, but in terms of compensating for any "decrease in

23    the value of [an] interest in property".  Id., at 803.  The Supreme Court's decision in Timbers

24    confirms the interpretation of section 361.

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1     **D.**    Emergency Authority to Use Cash Collateral is Warranted Under 11 U.S.C. § 363(c)(3)
2         and Rule 4001(b) to Allow the Debtor to Operate its Business.

3         The Debtor has requested an emergency hearing to consider the relief

requested in this Motion.  Section 363(c)(3) and Rule 4001(b)(2) require the Court to

schedule a cash collateral hearing in accordance with the needs of the debtor and conduct a

preliminary hearing for the purpose of authorizing the use of cash collateral to the extent

necessary to avoid irreparable harm to the Debtor.  Section 363(c)(3) mandates that "[a]ny

hearing [on the use of cash collateral] . . . shall be scheduled in accordance with the needs

of the debtor".  The Ninth Circuit has recognized that emergency relief is often crucial to the

success of a corporate reorganization:

> We realize that "in certain circumstances, the entire
> reorganization effort may be thwarted if emergency relief is
> withheld" and that reorganization under the Bankruptcy Code "is
> a perilous process, seldom more so than at the outset of the
> proceedings when the debtor is often without sufficient cash
> flow to fund essential business operations".  It is for this very
> reason that Congress specified that hearings concerning the use
> of cash collateral "shall be scheduled in accordance with the
> needs of the debtor".  11 U.S.C. § 363(c)(3).

In re Center Wholesale, Inc., 759 F.2d 1440, 1449 n. 21 (9th Cir. 1985)

(citations omitted).

       In this case, the Debtor's Property faces the imminent threat of going out of

business if cash collateral usage is not permitted immediately so that the Debtor can

meet its payroll obligations of $136,000 on Friday, April 29, 2011.

**E.**    Turnover by the City of Los Angeles and the Los Angeles Sheriff's Department and All

      Agents Acting on Their Behalf of Room Rental and Other Hotel Income Collected by

      The Keeper Put on the Hotel Property on or About April 19, 2011

       11 U.S.C. Section 541(a) provides, in relevant part, as follows:

       The commencement of a case under Secdtion 301, 302, or 303 of this title creates an

estate.  Such estate is comprised of all of the following property, wherever located, and by

whomever held:

       (I) …all legal or equitable interests of the debtor in property as of the commencement

1    of the case.  11 U.S.C. Section 541.  As a result, all property owned by the Debtor, whether

2    through legal or equitable means, is property of the Debtor's bankruptcy estate.  The

3    Property and all operations are clearly property of the Debtor's estate pursuant to Section

4    541 of the Code. The keeper put into the Property by the City who has been exerting

5    dominion and control over all income of the Property including but not limited to room rental

6    revenues, food and beverage revenues, parking revenues, storage revenues, convenience

7    store revenues.

8    Section 542 provides in pertinent part as follows:

9        (a)…other than a custodian, in possession, custody or control, during the
         case of property that the trustee may use, sell or lease under Section 363 of
10       this title…shall deliver to the trustee, and account for, such property or the
         value of such property, unless such property is of inconsequential value or
11       benefit to the estate.

12       11 U. S. C. Section 542.

13       Pursuant to Section 542, the keeper, through the City of Los Angeles, is required

14   to turn over property of the Debtor's estate back to the Debtor and account for all such

15   property.  11 U.S.C. Section 543 provides, in relevant part, as follows:

16       (a) A custodian with knowledge of the commencement of a case under this
         title concerning the debtor may not make any disbursement  from, or take
17       any action in the administration of, property of the debtor, proceeds,
         product, offspring, rents or profits of such property, or property of the estate,
18       in the possession, custody or control of such custodian, except such action
         as is necessary to preserve such property.

19       (b) A custodian shall—
20
         (1) deliver to the trustee any property of the debtor held by or transferred to
21       such custodian, or proceeds, product , offspring, rents, or profits of such
         property, that is in such custodian's possession, custody or control on the
22       date that such custodian acquires knowledge of the commencement of the
         case; and
23
         (2) file an accounting of any property of the debtor, or proceeds, product
24       offspring, rents, or profits of such property that, at any time, came into the
         possession, custody or control of such custodian.
25
         Turnover is favored because "a substantial weight is added to the debtor's
26
     reorganization if the debtor cannot have access to all of its assets during its initial breathing
27
     spell.  In re KCC-Fund V. Ltd., 96 B.R. 237, 239-40 (Bankr. M.D. Mo. 1987).  If a custodian
28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1   turns over the Debtor's property before a Section 543(d)(1) motion seeking to excuse

2   compliance is made, the court may not revest the custodian with the Debtor's property. In re

3   Watkins, 63 B.R. 46, 47-48 (Bankr. D. Colo., 1986); see also, In re Paul, 67 B.R. 347 (Bankr.

4   D. Mass., 1986).

5        In this case, the keeper put on to the Property by the City of Los Angeles has swept

6   approximately $180,000 which is currently held at a bank (Citibank) and has not been turned

7   over to the City.  There are a number of problems with any claim that the City might make to

8   those proceeds:

9        1.    Previously, the City was an unsecured creditor of Majestic Towers, one

10  of the Debtors herein.  When it first took possession of the hotel rental and other income

11  beginning no earlier than April 19, 2011, it is clear that the City has been the recipient of an

12  avoidable preference.  As a result, any interest that they have in the rents is automatically

13  released under the provisions of Section 493.060 of the California Code of Civil Procedure,

14  such lien is released upon the Debtor's Bankruptcy Filing.  Further, if it is not released by the

15  applicable provisions of California law, their right in the rentals is still a clear preference which

16  will be avoided by the Debtor under Section 547 of the Bankruptcy Code.  Without any

17  interest in the rentals and other income from the Property, there is nothing standing in the

18  way, including any possible adequate protection arguments by the City, that would prevent

19  the immediate turnover of the rental collections seized by the keeper.

20       2.    The proceeds held in the bank account which have been taken by the

21  keeper installed on the Property by the City of Los Angeles constitute the cash collateral of

22  True North.  As their cash collateral and because of the senior and prior lien held by True

23  North on those rental collections, the City has no right to those rental proceeds and the funds

24  being held must be turned over to the Debtor subject to the cash collateral rights of True

25  North.

26       3.    Turnover is mandated by Section 542 and 543 of the Bankruptcy Code

27  as detailed above.

28       4.    Last, Section 105(a) of the Bankruptcy Code provides that the

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate

2    to carry out the provisions of this title." Section 105(a) of the Bankruptcy Code thus

3    empowers the Court to grant injunctive relief to prevent harm to the debtor, its estate  and its

4    creditors. See, In re Chateaugay Corp., 109 B.R. 613, 622 (S.D.N.Y. 1990).  Courts have

5    repeatedly held that a bankruptcy court "has authority under Section 105 broader than the

6    automatic stay provisions of Section 362 and may use its equitable powers to assure the

7    orderly conduct of the reorganization proceedings. See, In re Baldwin United Lit., 765 F.2d.

8    343, 348 (2nd Cir., 1985) (emphasis added); In re Chateaugay Corp., 93 B.R. 26, 29

9    (S.D.N.Y. 1988).

10           The Debtor's bankruptcy estate cannot be administered and preserved for the

11    benefit of the creditors without the access to its assets.  In addition to turnover under

12    Sections 542 and 543 of the Bankruptcy Code, the Court's equitable powers under Section

13    105(a) should be applied to compel immediate turnover and an accounting.

14           Based upon the foregoing, and the declaration of Barry Caplan separately filed

15    herewith, the Debtor is entitled to the following relief-(a) turnover of all rents and other funds

16    from any source collected by the keeper at the instigation of the City of Los Angeles, (b) an

17    accounting from the keeper and the City of Los Angeles and the Los Angeles County

18    Sheriff's Department of all rents collected and all other actions taken during the time that they

19    acted as keeper on the Property, (c) an order providing that the keeper as part of his

20    obligation to turnover property shall cease and desist from any further efforts in this regard

21    and that the keeper shall immediately vacate the Property to the extent that they have

22    violated the automatic stay by remaining on it for any time after the bankruptcy filing, (d) for

23    relief provided for herein as permitted under Section 105(a) of the Bankruptcy Code.

24

25                                              **V.**

26                                        **Conclusion**

27           For the foregoing reasons and based upon the evidence submitted, the

28    Debtor requests that it be immediately permitted to use cash collateral according to the

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    terms and conditions of Exhibit "14" attached hereto.  The Debtor also requests turnover

2    and an accounting from the keeper put on to the Debtor's Property and a further order

3    that the keeper and the Los Angeles County Sheriff's deputies and all personnel acting

4    under their direction with respect to the keeper shall leave the Debtor's Property and

5    cease and desist from all collection efforts at any time after the filing of Debtor's Chapter

6    11 case.  The Debtor requests such other and further relief as is just and appropriate in

7    the circumstances.

8

9    DATED: April _____, 2011            Respectfully submitted,

10                                       **Sulmeyer**Kupetz
                                         A Professional Corporation
11

12

13                                       By: _____
                                             Victor A. Sahn
14                                           Mark S. Horoupian
                                             Attorneys for Chapter 11 Debtor and Debtor in
15                                           Possession

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

## Declaration of Victor A. Sahn

I, Victor A. Sahn, hereby declare:

1.     I am a member of SulmeyerKupetz, counsel of record to the Chapter 11 Debtor in Possession. I submit this Declaration in support of the Debtor's Motion for Authorization to Use Cash Collateral, for Turnover all related relief contained in the attached Motion. I submit this declaration based upon my personal knowledge and if called as a witness, would testify to each of the matters stated herein under the penalty of perjury.

2.     On April 27, 2011, I placed a telephone call to Scott McPhee, one of the counsel to True North Mezzanine, one of the secured creditors of the Chapter 11 Debtor. I spoke with Mr. McPhee after leaving him a detailed voicemail message that the Debtor intended to file a Chapter 11 case and seek an emergency hearing before the Bankruptcy Court regarding usage of cash collateral and turnover of rents and related relief. This call was placed at approximately 5:00 p.m., Pacific Time, on April 27, 2011.

3.     Shortly after or before 5:00 p.m., Pacific Time, on April 27, 2011, I placed a call to Suzanne Spillane. Ms. Spillane is employed by the City Attorney for the City of Los Angeles and is one of the counsel responsible for representing the City in the Debtor's matter. I left Ms. Spillane a detailed voicemail message indicating the Debtor's intention to seek relief under Chapter 11 of the Bankruptcy Code and of our further intention to seek usage of cash collateral and turnover of rentals collected by the City of Los Angeles. I followed up the detailed voicemail message with a detailed email providing Ms. Spillane with the identical information to that which was provided in my voicemail message to her personal work voicemail.

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1         4. Once a hearing date, time and place for the cash collateral hearing and

2  request for turnover and related relief is received from the Court, we will give further and

3  specific notice to these same parties as prescribed by the Court.

4         I declare the matters stated herein to be true under the penalty of perjury.

5  Executed this 29 day of April, 2011 at Los Angeles, California.

6

7                                 Victor A. Sahn

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**EXHIBIT 1**

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $26,520,000.00 | 08-25-2005 | 08-25-2012 | 247891 | 76/71/72/55 | 143448 | KYK | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  LEO Y. LEE and HYO S. LEE aka HYO SUN LEE,
Trustees of THE LEE 2003 FAMILY TRUST DATED
APRIL 8, 2003
61 FREMONT PLACE
LOS ANGELES, CA 90005

**Lender:**  CENTER BANK
GARDENA OFFICE
1400 WEST REDONDO BEACH BOULEVARD
GARDENA, CA 90247-3311

THIS BUSINESS LOAN AGREEMENT dated August 25, 2005, is made and executed between LEO Y. LEE and HYO S. LEE aka HYO SUN LEE, Trustees of THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 under the provisions of a trust agreement dated April 8, 2003 ("Borrower") and CENTER BANK ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loan"). Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of August 25, 2005, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any indebtedness exists:

**Organization.** THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 is a trust which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 maintains an office at 61 FREMONT PLACE, LOS ANGELES, CA 90005. Unless the trustees have designated otherwise in writing, the principal office is the office at which THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 keeps its books and records including its records concerning the Collateral. The trustees will notify Lender prior to any change in the location of THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 's state of organization or any change in THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 's name. The trustees shall do all things necessary to preserve and to keep in full force and effect THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 's existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 and THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of Borrower's Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat,

EXHIBIT _____



## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 247891                                                                                     Page 2

dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| LEO Y. LEE | Unlimited |
| HYO S. LEE aka HYO SUN LEE | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or

# BUSINESS LOAN AGREEMENT
**Loan No: 247891**                    **(Continued)**                    **Page 3**

a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of the Trust, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.



## BUSINESS LOAN AGREEMENT
### (Continued)

Loan No: 247891                                                                                              Page 4

---

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**\*\*LOAN CONDITIONS:.**
1. BORROWER TO SUBMIT THE OPERATING STATEMENT ON A MONTHLY BASIS FOR ONE YEAR.
2. BORROWER TO SUBMIT THE COMPANY'S TAX RETURN WITHIN 45 DAYS FROM ITS FILING DATE.
3. BORROWER TO SUBMIT THE INDIVIDUAL TAX RETURN WITHIN 45 DAYS FROM ITS FILING DATE. —
4. INTEREST RATE TO BE REDUCED BY 0.25% UPON THE SUBJECT REACHED AT DEBIT SERVICE COVERAGE RATIO 1.4X.
5. BORROWER TO PAY DOWN $1,000,000.00 WITHIN 1ST YEAR FROM THR FUNDING DATE (WITHOUT ANY PREPAYMENT PENALTY).
6. BORROWER TO PAY DOWN $2,120,000.00 WITHIN 12 MONTHS FROM THE DATE OF FIRST PAY-DOWN (WITHOUT ANY PREPAYMENT PENALTY).
7. 3RD DEED OF TRUST OF GUARANTOR'S SINGLE FAMILY RESIDENCY TO BE PLEDGED AS ADDITIONAL COLLATERAL- TO BE RELEASED UPON THE COMPLETION OF $3,120,000.00 PAY DOWN.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by, construed and enforced in accordance with federal law and the laws of the State of California. This Agreement has been accepted by Lender in the State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.



# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 247891                                                                 Page 5

---

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means LEO Y. LEE and HYO S. LEE aka HYO SUN LEE, Trustees of THE LEE 2003 FAMILY TRUST DATED APRIL 8, 2003 under the provisions of a trust agreement dated April 8, 2003 and includes all co-signers and co-makers signing the Note.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means CENTER BANK, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by Borrower in the principal amount of $26,520,000.00 dated August 25, 2005, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.